UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAUWYINCE FOUNTAIN<br><br>    Plaintiff,<br><br>    v.<br><br>CITY OF JERSEY CITY; JERSEY CITY POLICE DEPARTMENT; Police Officer DAVID MCNEESE, Individually and in his/her official capacity as a Police Officer for the Jersey City Police Department JOHN DOES 1-10 (fictitious names), Individually and in his/her official capacity as a Police Officer for the Jersey City Police Department,<br><br>    Defendants. | Civil Case No. _____<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

The Plaintiff, Jauwyince Fountain, ("Plaintiff" or "Fountain") residing in Jersey City, New Jersey, complaining of the Defendants, says:

## JURISDICTION AND VENUE

1. This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3). This Court has supplemental jurisdiction over the state law causes of action under 28 U.S.C. § 1367(a).

2. Venue is proper in this District pursuant to 28 U.S.C. 1391(b)(2) because the events/omissions giving rise to these causes of action all occurred in the District of New Jersey.

## PARTIES

3. Plaintiff was at all material times a resident of Hudson County, New Jersey.

4. The City of Jersey City is a municipal corporation and a public employer of the individual Defendants.

5. The Jersey City Police Department is and was, at all times in the relevant time period, a division and/or department of the City of Jersey City entrusted with, among other things, enforcing federal, state and local laws and ordinances, and otherwise ensuring the safety of people and property within the jurisdictional limits of the City of Jersey City.

6. Police Officer DAVID MCNEESE, is a police officer, employees, agents and/or representatives of the City of Jersey City and/or Jersey City Police Department whose unlawful actions are described, referenced and/or set forth herein. All are being sued individually and in their official capacities.

7. Defendants John Does 1-10, are presently unknown police officers, employees, agents and/or representatives of the City of Jersey City and/or Jersey City Police Department

whose unlawful actions are described, referenced and/or set forth herein. All are being sued individually and in their official capacities.

8. Plaintiff has complied with all statutory prerequisites to her Title VII claims, having filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), and having received notice of her right to sue from the EEOC, dated September 24, 2018. This action has been filed within 90 days of receipt of her EEOC right to sue letter.

## CAUSE OF ACTION

9. This is an action for declaratory, injunctive and monetary relief to redress the unlawful discrimination, hostile work environment and retaliation committed against Plaintiff throughout her employment in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 ("Section 1981). Furthermore, in this action, plaintiffs seeks compensatory damages and attorneys' fees, costs and expenses to redress defendant's unlawful disability discrimination against plaintiffs, in violation of Title II of the Americans with Disabilities Act ("ADA") 42 U.S.C. § 12131 et seq. and Section 504 of the Rehabilitation Act ("Rehabilitation Act") 29 U.S.C. § 794, et seq.

10. Defendant's conduct also is in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. "(Title VII"). Plaintiff has filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") with regard to these violations and has received a Notice of Right to Sue.

## FACTS

11. Ms. Fountain was hired by Jersey City as a public safety telecommunications trainee on or about October 9, 2012.

12. On or about January 1, 2014, Fountain became a public telecommunicator.

13. After a brief leave of absence, Ms. Fountain was rehired in the same capacity on or about January 20, 2017.

14. Ms. Fountain's troubles began when she started working under her supervisor Sergeant Burroughs.

15. Sergeant Burroughs created a hostile work environment for Ms. Fountain.

16. For example, Sergeant Burroughs would write up Ms. Fountains for trivial reason.

17. In or about winter of 2016, Ms. Fountain went to the supervisor's desk, which is a shared desk, to get antibacterial wipes to clean her work area (something Ms. Fountain did on a daily basis).

18. Sergeant Burroughs used her foot to stop Ms. Fountain from getting the wipes from the desk and wouldn't let her use them.

19. Ms. Fountain sent an email to Sergeant Burroughs's supervisor, Assistant Director McNeese.

20. However, the Assistant Director took no action and forwarded her complaint to the Sergeant Burroughs.

21. The same day Sergeant Burroughs's received the email, she wrote Ms. Fountain up for taking wipes from the desk.

22. Ms. Fountain was charged with insubordination and suspended.

23. As a result of the immature behavior by her supervisors and not knowing whether she would be suspended or fired for frivolous interactions , Ms. Fountain developed anxiety.

24. Ms. Fountain felt that she had to worry about small things like this while working with this supervisor and it made it difficult to do my job effectively.

25. Her heart would race, she would get clammy hands, and it made it difficult to do simple tasks.

26. In or around March of 2017, Ms. Fountain was diagnosed with anxiety.

27. In or about March of 2017, she made her supervisors aware of her diagnosis.

28. In March, May and August of 2017, Ms. Fountain asked, Assistant Director of Communications, David McNeese, on several occasions, for a reasonable accommodation for her anxiety.

29. Other people were offered accommodations due to disabilities or hostile work environment.

30. For example, Ms. Fountain's co-worker, Wally Martinez had an argument with a Sergeant and was able to change her section position. to accommodate her.

31. Ms. Fountain's co-worker, Raquel Lopez has had anxiety attacks at work and was moved to another shift temporarily to be away from a supervisor until she was able to return to her normal shift.

32. Furthermore, Ms. Fountain's co-worker John Kilroy provided a note from his doctor, upon information and belief stating that the stress of the job was too much strain on him and he was accommodated by not having to work mandatory overtime.

33. In addition, Ms. Fountain's co-worker, Nicole Dilucci provided a doctor's note upon information and belief , stating that due to her pregnancy, she could not work overnight, she was accommodated. Accommodations happen frequently.

34. In retaliation for Ms. Fountain's complaint about her supervisor, Ms. Foutain, a union employee was demoted and suspended without a hearing.

35. She was reassigned to report to a dark room with a couch. She did not receive any over-time or have any job assignments.

36. Because of the hostile work environment, Ms Fountain took the NJ Civil Service Exam and was selected candidate for Hudson County Corrections Officer and Jersey City Police Officer.

37. Upon information and belief Ms. Fountain was on her way to be hired by either agency until her head supervisor, Director Baker called the Corrections and Jersey Police Department and told them that Ms. Fountain was under investigation and that she was suspended.

38. There were never any formal charges filed against Ms. Fountain as a result of the investigation into her alleged failure to dispatch police to a shooting.

39. However, as a result of Director Baker's actions, she was not hired.

40. Furthermore, the Jersey City Police department negligently released medical records and military records to Director Baker.

41. As a result of their negligent actions, Ms. Fountain was denied opportunities for overtime and new employment and once again suspended.

42. hen Ms. Fountain passed her civil service exam to become a police officer in Jersey City, she was told by David McNeese, Roseann Manto and Julio Cordero that she would have to resign from my position as a Public Safety Telecommunicator

43. They informed her that to go for another job is, by contract, not allowed.

44. However, two of Ms. Fountain's white co-workers, Nicole Dilucci and Tyler Hanson , went to the police academy and they both were allowed to take a leave of absence in case they failed the academy,

**FIRST CAUSE OF ACTION**
**(Discrimination in Violation of Section 1981) (Against All Defendants)**

45. Plaintiff repeat and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

46. Defendants have discriminated against Plaintiffs on the basis of their race and/or color in violation of Section 1981 by denying them the same terms and conditions of employment available to employees who are White, including, but not limited to, subjecting them to disparate working

conditions, repeatedly subjecting them to racist comments and slurs and ultimately terminating their employment.

47. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which they are entitled to an award of damages.

48. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981, Plaintiffs have suffered, and continue to suffer, mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering for which they are entitled to an award of damages.

49. Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Section 1981 for which Plaintiffs are entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**(Violations of the Americans with Disabilities Act)**

50. Plaintiffs reallege and incorporate by this reference all allegations set forth in this Complaint as if fully set forth herein.

51. Title II of the Americans With Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

52. The term "disability" includes physical and mental impairments that substantially limit one or more major life activities. Plaintiff is limited in the life activity of walking and body motion range and thus has a disability within the meaning of the ADA. As a direct and

proximate result of Plaintiff's disability, Plaintiff uses a walker for mobility. 42 u.s.c.§ 12102(2).

53. A "public entity" includes state and local governments, their agencies, and their instrumentalities. 42 U.S.C. § 12131(1).

54. Defendant qualifies as a public entity within the meaning of 42 U.S.C. § 12131 and 28 C.F.R.. § 35.104.

55. The School District's failure, among other things, to permit Plaintiff to participate in the emergency preparedness program, to implement an appropriate safety plan for the evacuation of Plaintiff. U.S.C. § 12132, and its implementing regulations, 28 C.F.R. Part 35, because defendant's conduct:

    Excludes individuals with disabilities from participation in and denies them the benefits of the services, programs or activities of a public entity;

    Does not afford qualified individuals with disabilities an opportunity to participate in or benefit from the services, programs, or activities of a public entity that is equal to that afforded others; and Fails to make reasonable modifications in policies, practices, and procedures when the modifications are necessary to avoid discrimination on the basis of disability.

56. Defendant subjected plaintiffs to disparate treatment by denying plaintiffs full and equal opportunity to use the workplace premises, all because plaintiff is disabled. Defendant's policies and practices disparately impacted plaintiffs as well.

57. Defendant's facility was not fully accessible and failed to provide an integrated and equal setting for the disabled, all in violation of the ADA.

58. Defendant's failure to make the facility accessible denied plaintiffs the opportunity to participate

        in or benefit from services or accommodations of the workplace because of disability.

59. Defendant utterly failed to satisfied their statutory obligation to ensure that their policies, practices, procedures for persons with disabilities are compliant with the laws. Nor did defendant make or provide reasonable accommodations or modifications to plaintiff's disabilities.

60. Section 35.15l(b)(l) of 28 C.F.R. Part 35 requires that: "Each facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities, if the alteration was commenced after January 26, 1992."

61. At some time after January 1992, defendant made alterations to the High School and upon altering their facility, defendant failed to make the facility accessible to plaintiffs to the maximum extent feasible.

62. Section 35.15l(b)(4) of 28 C.F.R. Part 35 requires that: "an alteration that affects or could affect the usability of or access to an area of the facility that contains a primary function shall be made so as to ensure that, to the maximum extent feasible, the path of travel to the altered area and the restrooms, telephones, and drinking fountains serving the altered area are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, unless the cost and scope of such alterations is disproportionate to the cost of the overall alteration."

63. Defendant also violated the ADA because it has failed to "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. §35.150(a)(l).

64. Also known as the "program access" requirement and, as explained in the preamble to the regulations of Title II, "although title II may not require removal of barriers in some cases where removal would be required under title III, the program access requirement of title II should enable individuals with disabilities to participate in and benefit from the services, programs, or activities of public entities in all but the most unusual cases." Preamble to Regulations on Nondiscrimination on the Basis of Disability in State & Local Government Services, 28 C.F.R.

Pt. 35, App. A.

65. Defendant acted with deliberate indifference to Plaintiffs rights as guaranteed under the ADA.

66. Defendant has had actual knowledge of the discrimination and deliberately decided not to address the discrimination and institute corrective measures.

67. As a proximate result of defendant's violations of the ADA, plaintiffs have been injured, as set forth herein in the amount of at least One Million Dollars, with the total amount to be determined at trial.

### THIRD CAUSE OF ACTION
### (Violations of the Section 504 of the Rehabilitation Act)

68. Plaintiffs reallege and incorporate by this reference all allegations set forth in this Complaint as if fully set forth herein.

69. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (hereinafter also referred to as "Section 504") and the regulations promulgated thereunder, prohibit discrimination against people with disabilities by recipients of federal funding. Section 504 provides, in pertinent part, that:

> No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance …

70. Defendant received federal financial assistance at all relevant times.

71. Although disabled, plaintiff Plaintiff was "otherwise qualified" to participate in all workplace activities.

72. Through the acts and omissions alleged herein, defendant excluded plaintiff from participation in defendant's programs and activities and denied plaintiffs the benefits of defendant's programs and activities, and subjected plaintiffs to discrimination in violation of 29 U.S.C. § 794, et. seq. and the regulations promulgated thereunder.

73. Defendant's acts and omissions described herein violate the equal access and nondiscrimination provisions of Section 504 and the regulations promulgated thereunder, and have resulted in injury to plaintiffs.

74. Defendant acted with deliberate indifference to Plaintiffs' rights guaranteed under Section 504.

75. Defendant has had actual knowledge of the discrimination and deliberately decided not to address the discrimination and institute corrective measures.

76. As a proximate result of defendant's violations of Section 504, plaintiffs have been injured, as set forth herein in the amount of at least One Million Dollars, with the total amount to be determined at trial.

### FOURTH COUNT

### Municipal Liability
### *Monell*, NJCRA, Negligent Supervision/Negligent Training/Municipal Liability

77. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

78. At all relevant times, Defendants, Jersey City and Jersey City Police Department, were the employer of the individual Defendants and the individual Defendants were acting as their agents, servants and employees.

79. Jersey City and Jersey City Police Department, failed to use reasonable care in the selection of its employees, and/or servants, failed to properly train and/or supervise the individual Defendants, and failed to provide the appropriate safeguards to prevent the assault, false arrest, improper detention and imprisonment, malicious prosecution, use of excessive force, and violation of the rights of Plaintiff.

80. For example, Jersey City and Jersey City Police Department, failed to train the officers in handling medical information subject to HIPAA laws and the Privacy Act .

81. By way of further example, Jersey City failed to train its officers in discrimination in the workplace and investigation and suspension of employee matter protocol.

82. Jersey City thus created a tacit policy and custom of permitting the Defendant officers' actions to continue with their imprimatur.

83. What is more, despite the obvious need for supervision of the Defendant officers and other officers who are known to violate the rights of others, no additional or meaningful supervision is provided to these individuals. This sends the message that there is a culture where officers can act with impunity and will never be held accountable.

84. Jersey City and Jersey City Police Department and its Officers acted under color of law pursuant to an official policy or custom and practice of Jersey City and Jersey City Police Department whereby retaliation is condoned, permitted, tolerated, encouraged, and, in addition to suspend employees without probable cause, and intentionally, knowingly, recklessly or with deliberate indifference failed to properly and adequately control and discipline on a continuing basis its employees, agents and/or servants and/or otherwise failed to prevent the individual Defendants from unlawfully and maliciously retaliating upon Plaintiff in violation of the rights, privileges and immunities guaranteed to Plaintiff by the Constitution and laws of the United States and/or New Jersey.

85. The public record is rife with officers run amok at the Jersey City Police Department with nearly twenty officers pleading guilty and/or being charged with crimes within the last few years—including the former chief of police.

86. It is clear that Jersey City and Jersey City Police Department willfully fail to supervise their officers such that officers feel that they can violate the law and the rights of civilians

with impunity. This deliberate indifference to the rights of citizens who are all but guaranteed to have their rights violated as a result is a policy and custom of Jersey City.

87. This causes a culture where, as here, officers, such as the Defendants, to feast on a sense of entitlement and impunity.

88. The lack of meaningful supervision has created a dangerous culture that encourages officers to violate the rights of civilians as they know that they will not be supervised or properly monitored or investigated.

89. Jersey City and Jersey City Police Department had knowledge of, or had it diligently and reasonably exercised its duties to instruct, supervise, control and discipline its employees, agents and/or servants, would have had knowledge of the wrongful acts and/or omissions identified above and intentionally, knowingly or with deliberate indifference to Plaintiff's rights, failed or refused to prevent their commission and/or omission.

90. Jersey City and Jersey City Police Department, therefore, directly or indirectly, and under color of law, thereby approved or ratified the unlawful, malicious and wanton conduct of the individual Defendants.

91. Finally, Jersey City and Jersey City Police Department maintained a policy whereby they failed to investigate employee' complaints thereby creating a policy and custom whereby supervisors felt that they could violate the rights of subordinates with impunity.

92. The heads of Plaintiff's department was alerted of the incident described herein, but Plaintiff has not received any correspondence from about the status of the investigation, if any.

93. It is clear that the Jersey City and Jersey City Police Department failed to investigate the

      internal affairs complaint of the Plaintiff and others.

94. Indeed, as part of the investigation, Jersey City and Jersey City Police Department failed to interview witnesses or seek video and other evidence.

95. This is because Jersey City and Jersey City Police Department do not wish to meaningfully investigate complaints and associated matters.

96. As a direct and proximate result of Defendants' acts and/or omissions, Plaintiff was humiliated, disgraced, suffered damage to his reputation, physical and mental anguish and injury and monetary loss and damage all to his great detriment.

## FIFTH COUNT
### Conspiracy

97. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

98. The Defendants agreed explicitly and through their actions that they would violate the rights of Plaintiff by retaliating against her.

99. The acts mentioned herein could not be accomplished without the assistance and agreement of the Defendant officers.

100. Defendants conspired to violate the rights of Plaintiff.

## SIXTHCOUNT
### Intentional and Negligent Infliction of Emotional Distress

101. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

102. Defendants inflicted an immense amount of pain and suffering upon Plaintiff through their outrageous conduct of repeatedly striking the Plaintiff while he was defenseless and

on the ground.

103. Defendants' conduct shocks the conscience as it was unwarranted, unnecessary, excessive, and without any justification or provocation.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands that judgment be entered against the Defendants, jointly and severally, for:

(a) any and all damages sustained by the Plaintiff arising from the foregoing wrongful and unlawful acts of the Defendants;

(b) punitive damages;

(c) interest, both pre-judgment and post-judgment;

(d) attorney's fees;

(e) costs;

(f) injunctive relief, including but not limited to:

    (i) An order from this Court enjoining the Jersey City Police Department from continuing its pattern and practice of violating citizens' civil rights;

    (ii) placement of the Jersey City Police Department in receivership for the purpose of instituting programs to train, instruct, discipline, control, and supervise the officers of the Jersey City Police Department;

(g) and all such other relief as this court may deem appropriate, equitable, and just.

## JURY DEMAND

Plaintiff demands a trial by jury in this action for all issues triable by a jury.

## DESIGNATION OF TRIAL COUNSEL

Richard St. Paul, Esq. and Chris Pisacane are hereby designated as trial counsel.

## CERTIFICATION PURSUANT TO L.CIV.R.11.2

I certify that the matter in controversy is not the subject of any other action pending or contemplated. I further certify that at this time I am aware of no other parties who should be joined in this matter.

Dated:  White Plains, New York  
        December 24, 2018

Respectfully submitted

The St. Paul Lawfirm

By: /s Christopher Pisacane  
    Christopher M. Pisacane, Esq. (CP-1854)  
Of Counsel to the St. Paul Lawfirm  
445 Hamilton Avenue, Ste 1102  
White Plains, NY 10601  
Email: cpisacane@pisacanelaw.com